# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| SAMSON RESOURCES CORPORATION, | : | Case No. 15-11934 (BLS) |
| | : | |
| Reorganized Debtor. | : | |
| | : | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST, | : | Adv. Pro. No. 17-51524 (BLS) |
| | : | |
| Appellant, | : | |
| v. | : | Civ. No. 23-799-JLH |
| | : | |
| SAMSON ENERGY COMPANY, LLC, *et al.*, | : | |
| | : | |
| Appellees. | : | |

J. Christopher Shore, Colin T. West, White & Case LLP, New York, NY; Michael J. Farnan, Farnan LLP, Wilmington, DE

   *Counsel for Appellant*

Daniel M. Stern, Samuel M. Kidder, KTBS Law LLP, Los Angeles, CA; Andrew J. Gallo, Nathaniel P. Bruhn, Morgan, Lewis & Bockius LLP, Boston, MA; Bryan Killian, Morgan, Lewis & Bockius LLP, Washington, DC; Michael R. Nestor, Michael S. Neiburg, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE

   *Counsel for Appellees*

## **MEMORANDUM OPINION**

May 23, 2024

**HALL, U.S. DISTRICT JUDGE**

**I.      INTRODUCTION**

This appeal arises from the above-captioned adversary proceeding (the "Adversary Proceeding") filed in the chapter 11 cases of Samson Resources Corporation and certain of its affiliates.  The Adversary Proceeding sought the recovery of alleged fraudulent transfers arising out of the 2011 sale of Samson Investment Company ("SIC") by its owners, the Schusterman family, to a private equity consortium.  Pending before the Court is the motion (D.I. 26) (the "Certification Motion") of appellant, Peter Kravitz, as Settlement Trustee of and on behalf of the Samson Settlement Trust (the "Trustee"), for certification of a direct appeal to the United States Court of Appeals for the Third Circuit, pursuant to 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8006(f).  The Trustee seeks a direct appeal of the Bankruptcy Court's order, dated July 7, 2023 (Adv. D.I. 482)[1] (the "Final Judgment"), and accompanying opinion, *In re Samson Resources Corp.*, No. 15-11934, 2023 WL 4003815 (Bankr. D. Del. June 14, 2023) (the "Opinion"), which found that the 2011 sale of SIC did not constitute a fraudulent transfer.  The Trustee further seeks to certify his appeals of two interlocutory orders, issued on January 6, 2021 (Bankr. D.I. 294) and August 23, 2022 (Bankr. D.I. 400) (the "Interlocutory Orders"), which together held that certain transfers made by SIC fall within the Bankruptcy Code's § 546(e) safe harbor.  For the reasons set forth below, the Court will deny the Certification Motion with respect to all three orders.

---

[1] The docket of the Chapter 11 case, captioned *In re Samson Resources Corp.*, No. 15-11934 (BLS) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __."   The docket of the adversary proceeding, captioned *Kravitz v. Samson Energy Co., LLC*, Adv. No. 17-51524 (BLS) (Bankr. D. Del.), is cited herein as "Adv. D.I. __."

1

## II. BACKGROUND

On December 21, 2011, the Schusterman family—the founders and shareholders of SIC—sold SIC, an oil and gas exploration and production company that had been operating successfully for 40 years, to a consortium of equity sponsors (the "Transaction"). Through the Transaction, the post-sale entity Samson Resources Corporation ("Samson") incurred $3.6 billion in new debt on the one hand, and on the other (a) distributed approximately $7.2 billion in cash to the shareholders, and (b) spun off certain assets to Samson's outgoing CEO's new business interests.

Just over three and a half years later, on September 16, 2015, Samson and its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On February 13, 2017, the Bankruptcy Court entered an Order confirming the Debtors' plan of reorganization (the "Plan"). Among other things, the confirmed Plan provided for the creation of the Samson Settlement Trust, which received ownership of, and the right to prosecute, certain estate causes of action, including causes of action arising out of the Transaction. The Trustee alleges that the purchasers vastly overpaid for the business, thereby enriching the former shareholders to the detriment of Samson's creditors. As the Bankruptcy Court summarized, "By paying over twice what he alleges was the fair market value of the company, the [Trustee] contends that the new owners were obliged to burden the Company with more debt than it could service, giving rise to a death spiral that led ultimately and directly to the company's bankruptcy filing." *In re Samson*, 2023 WL 4003815, at *1. Accordingly, on September 15, 2017, the Trustee filed a Complaint against individual members of the Schusterman family and certain family trusts that, prior to the 2011 sale, owned or held the stock of SIC (together, the "Defendants"), seeking recovery for the alleged fraudulent transfers arising from the Transaction.

2

A central dispute in this case is the value of SIC's onshore business at the time of the Transaction and how that value compares to both the purchase price paid and the debt that Samson was obligated on immediately following the sale. Defendants contend that the sale price negotiated and ultimately paid to the Schustermans—approximately $7.2 billion—represented the fair market value of the company at that time. Likewise, Defendants assert that the consideration provided by the Schustermans essentially to retain other portions of the business represented the fair market value of those assets as part of the Transaction. The Trustee takes the position that the Sponsors' decision to pay $7.2 billion for Samson in an LBO[2] was "premised on fundamental, dramatic analytical errors in [the buyer's] business plan that resulted in a substantial overstatement of estimated future cash flows." (D.I. 26 at 10, 13.) As a result, the Trustee contends, the price paid was "substantially more than fair market value," and the Transaction also "over-levered" post-closing Samson to such an extent that it was insolvent on a balance sheet basis." (*Id.*) Thus, according to the Trustee, the transfers of $7.18 billion made to Defendants as an integral part of that buyout should be avoided. (*Id.*)

The Bankruptcy Court presided over a three-week trial in 2022. At trial, the Trustee called three expert witnesses who collectively offered their opinions regarding the proper valuation of SIC in 2011, which included expert testimony (1) on issues relating to commodity prices and commodity hedging and their relation to an appropriate stress or downside case, (2) on issues relating to petroleum engineering, (3) on issues of solvency and valuation, and (4) the valuation model prepared for trial. In response, Defendants called witnesses who submitted both written

---

[2] According to Defendants, the Transaction was not an LBO, as the term "leveraged buyout" simply "refers to the acquisition of a company ('target corporation') in which a substantial portion of the purchase price paid for the stock of the target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquirer invests little or no equity." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 645 (3d Cir. 1991). Here, Defendants argue, "purchasers invested $4.145 billion of their own money." (D.I. 50 at 9 n.4.)

and live testimony to the Bankruptcy Court. Defendants' primary witnesses were (1) a fact witness describing the circumstances surrounding the negotiation and documentation of the Transaction, (2) a valuation expert testifying in rebuttal to the valuation model, and (3) an investment banker offering testimony as to the sufficiency of the sale process and related due diligence, as well as Samson's post-Transaction business plan. Defendants' witnesses did not offer a traditional valuation to counter that presented by the Trustee. Rather, Defendants focused on setting forth the factual record of the negotiations and due diligence efforts, and their case rested largely on the proposition that the actual sale results provide a more accurate and reliable indicator of SIC's value in 2011 than the Trustee's expert valuation report prepared long after the deal closed.

Pursuant to a pre-trial order, the parties agreed to a statement of stipulated facts, which was admitted into evidence without objection. The Court also accepted into evidence 32 deposition transcripts and 1130 trial exhibits. Following the close of evidence in late September 2022, each side prepared and filed comprehensive proposed findings of fact and conclusions of law. Closing arguments occurred over the course of a full day on December 8, 2022.

On June 14, 2023, the Bankruptcy Court issued its 74-page Opinion containing its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, ultimately determining that the Trustee had "failed to prove that the consideration paid in connection with the 2011 acquisition of SIC did not reflect its fair market value at the time." *In re Samson*, 2023 WL 4003815, at *1.

On or around July 21, 2023, the Trustee filed his Notice of Appeal with respect to the Final Judgment as well as the Interlocutory Orders. (D.I. 1.) On October 17, 2023, the Trustee filed the Certification Motion. (D.I. 26.) The Certification Motion is fully briefed. (D.I. 26, 50, 54.) This matter was reassigned to me on January 8, 2024.

## III.   JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this appeal from the Bankruptcy Court under 28 U.S.C. § 158.  Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders and decrees" and discretionary jurisdiction over appeals "from other interlocutory orders and decrees."  28 U.S.C. § 158(a)(1),(3).  Motions for direct appeal to the court of appeals are governed by 28 U.S.C. § 158(d)(2), which provides that a district court may certify a final order for immediate appeal to a federal court of appeals.  Under § 158(d)(2)(A) and (B), certification is mandatory if the Court determines that any of the following exist:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A); *In re Tribune Co.*, 477 B.R. 465, 470 (Bankr. D. Del. 2012).  "While the section contains three subparts, there are actually four disjunctive criteria as subpart (i) sets forth two separate benchmarks for certification."  *In re Millennium Lab Holdings, II, LLC*, 543 B.R. 703, 708 (Bankr. D. Del. 2016).  When an appellant complains about an "[a]pplication of long-standing, settled law to the facts of a particular case," that "is not a basis for direct appeal to the Third Circuit."  *Id.* at 709.

## IV.   ANALYSIS

Bankruptcy Rule 8006 requires any request for certification of a direct appeal to identify the "the question itself" presented—that is, the question that the court of appeals will answer.  Fed.

5

R. Bankr. P. 8006(f)(2)(A),(B).  The Certification Motion identifies the following related questions for appellate review:

> (1) whether an LBO transaction can ever constitute a constructively fraudulent transfer (D.I. 26 at 10);
>
> (2) whether a "debtor" can be a "financial participant" under the Bankruptcy Code (*id*. at 16); and
>
> (3) whether a debtor-transferor needs to be a "financial participant" at the time of a transfer for the safe harbor to apply (*id*. at 21).

These questions are poor candidates for direct review of this appeal.

### A. The First Question, Challenging Findings Relevant to Reasonably Equivalent Value, Does Not Warrant Direct Appeal.

According to the Trustee, the Bankruptcy Court refused to engage with the reports and testimony submitted by its valuation experts and instead erroneously adopted Defendants' "circular theory" of valuation, assuming that it was required, as a matter of law, to treat whatever purchase price was actually paid for an asset as the fair market value.  (*Id.* at 8.)  The Trustee largely bases this assertion on one phrase (emphasized below) in the introductory paragraph to the Bankruptcy Court's 74-page Opinion:

> It is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market. A thing is worth what a willing buyer will pay to a willing seller following a proper marketing process. This standard places primacy on the reliability of a transaction where parties have evaluated risk and reward and placed their own money on the line. Buyers and sellers may be right or wrong about what the future may hold, but ***the value is fixed and conclusively established by the price paid at closing***. Under this approach, the opinion of a valuation expert, invariably influenced by hindsight, is by definition less reliable than a closed sale by market participants. As a practical matter, it is incumbent on a party challenging the value of a sold asset to demonstrate that the marketing and sale process was irretrievably tainted or deeply flawed.

*In re Samson*, 2023 WL 4003815, at *1 (emphasis added); *see* D.I. 26 at 2, 3, 7, 8, 12, 15 (repeatedly quoting this phrase). According to the Trustee, this language demonstrates that the Bankruptcy Court adopted a rule of law that the purchase price is "*per se* reasonable" and "dispositive of the value exchanged." (*Id.* at 3, 12, 14–15.) The Trustee further purports to extend this asserted *per se* ruling "to its logical conclusion" (*id*. at 14), arguing that, if the purchase price "conclusively" establishes the fair market value, "it would effectively immunize LBOs from fraudulent transfer challenge." (*Id*. at 4; *see also id*. at 11 ("amounts to a rule that there is no such thing as a constructive fraudulent transfer in the context of an arm's-length LBO"); *id*. at 12 ("a challenged transaction could never fail"); *id*. at 13 ("an LBO without badges of fraud [] is immune from challenge").)

I disagree with the Trustee's characterization of the Bankruptcy Court's Opinion. The introductory paragraph, read in the context of the rest of the thorough and well-reasoned findings of fact and conclusions of law, does not adopt or announce a *per se* rule, nor does it create any conflict with settled law in this circuit. As the Third Circuit has noted, "Absent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996) and citing, *inter alia*, *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) and *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002)). The Bankruptcy Court applied that settled precedent. The Bankruptcy Court did not conclude that "the price paid at closing" is always and inherently fair. Nor did it adopt a standard which flatly assumes that the purchase price is "dispositive of fair market value," as the Trustee asserts. Rather, the Bankruptcy Court explained that the purchase price can be "the 'best evidence' of fair market value" where there is additional evidence showing that "sophisticated

7

parties" made "reasoned judgments about the value" after "an extensive marketing process and negotiations." *In re Samson*, 2023 WL 4003815, at *25–26 (quoting *Allonhill, LLC v. Stewart Lender Servs., Inc.*, 2019 WL 1868610, at *40 (Bankr. D. Del. Apr. 25, 2019) (*aff'd in part*, 2020 WL 1542376, at *11 (D. Del. Mar. 31, 2020) (affirmed as to fraudulent transfer ruling), *reconsideration denied*, 2020 WL 6822985 (D. Del. Nov. 20, 2020); and *Peltz*, 279 B.R. at 738). Because the Bankruptcy Court did not adopt a *per se* rule, there is no pure question of law appropriate for certification to the Third Circuit.

The Trustee nevertheless maintains that the Bankruptcy Court "declined to engage with the substance of Appellant's case, which was based on traditional, bottom-up valuation methodologies approved by this Court, and the identification of fundamental, severe modeling errors in the business plan that caused the buyer to massively overpay for, and massively over-lever, the target business" and that the Bankruptcy Court "summarily dismissed Appellant's experts' objective evidence as 'hindsight'." (D.I. 26 at 3.)  That argument is, at bottom, a challenge to the weight the Bankruptcy Court gave to the purchase price in the course of making its finding that the purchase price was probative of the value of the business.  An argument that the Bankruptcy Court erred by misapplying the law to particular facts is not a pure question of law and thus does not warrant direct appeal. *Millennium Lab Holdings II*, 543 B.R. at 709; *Tribune*, 477 B.R. at 472.

The Trustee further argues that the *per se* rule allegedly adopted by the Bankruptcy Court "represents a sea change in the law of fraudulent transfers, particularly as it relates to LBOs," effectively immunizing them from fraudulent transfer challenge; thus, resolution of the question "involves a matter of public importance" warranting certification under § 158(d)(2)(A)(i).  (D.I. 26 at 15; D.I. 54 at 6–7.)  To constitute an issue of "public importance," the issue on appeal must transcend "the litigants and involve a legal question, the resolution of which will advance the cause

8

of jurisprudence to a degree that is usually not the case." *Am. Home Mortg. Inv. Corp.,* 408 B.R. 42, 44 (D. Del. 2009) (citing 1 *Collier on Bankruptcy* 5.05(A) (15th ed. rev.)). As an initial matter, as Defendants correctly point out, the term "leveraged buyout"—or LBO—is not a legal term of art," but rather "a shorthand expression describing a business practice." *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1292 (3d Cir. 1986). Even assuming that the sale of SIC was an LBO, the Bankruptcy Court's decision here does not call into question the "settled" rule "that the fraudulent conveyance provisions of the [Uniform Fraudulent Conveyance Act] extend to leveraged buyouts." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir. 1992). Not every LBO, even those that fit the Third Circuit's definition, is fraudulent. *See id.* at 1069–70; *see also Mellon Bank*, 945 F.2d at 638–39. Rather, the Third Circuit cases examining LBO transactions stand for the unremarkable proposition that LBO transactions can be deemed fraudulent if warranted by the facts of the transaction.

In short, the Bankruptcy Court did not apply a *per se* rule but rather followed Third Circuit law: it applied that law to the facts to determine whether the Transaction was a constructive fraudulent transfer. The Bankruptcy Court ultimately concluded that it was not, relying on evidence that SIC was solvent and that reasonably equivalent value was exchanged. The Bankruptcy Court's ruling, even if erroneous, was based on the facts of this particular case, and therefore presents no "sea change" in fraudulent transfer law.

      **B.    The Second and Third Questions Are Not Dispositive of the Appeal and Do Not Warrant Certification**.

The second and third questions for certification concern whether a "debtor" can be a "financial participant" whose transfers fall under 11 U.S.C. § 546—the "safe-harbor" provision of the Bankruptcy Code. Section 546(e) prevents the avoidance of certain transfers "made by or to (or for the benefit of)" certain persons, including, as relevant here, "financial participants." *See*

9

*id*.  To fall within the Code's definition of "financial participant," an entity must, *inter alia*, have certain types of financial contracts—here, oil and gas swaps—of a specified threshold value.  11 U.S.C. § 101(22A).  Among their pretrial summary judgment motions, Defendants sought to confirm their position that certain transferors, including SIC, qualified as financial participants, and thus, any and all of their transfers were safe-harbored.  The Bankruptcy Court agreed with Defendants in two Interlocutory Orders.  *See In re Samson Res. Corp.*, 625 B.R. 291 (Bankr. D. Del. 2020); *In re Samson Res. Corp.,* No. 15-11934, 2022 WL 3135288, at *5 (Bankr. D. Del. 2022).  After trial, however, the Bankruptcy Court found, as a matter of fact, that all transferors were solvent and received reasonably equivalent value for the transfers.  As a result of those findings, none of the challenged transfers is avoidable as to any Defendant.  Consequently, the safe harbor rulings that the Bankruptcy Court resolved in its Interlocutory Orders were not necessary to the final judgment.

      The Trustee contends that direct appeal of the Interlocutory Orders is still necessary so that the Third Circuit may answer two questions with respect to the meaning of § 546(e): whether a debtor can be a "financial participant" (*see* D.I. 26 at 16–21), and whether the petition date is an appropriate time for determining whether the debtor is a "financial participant" (*see id*. at 21–22).  According to the Trustee, each of these safe harbor questions are "novel" and "highly important to financial markets" and therefore certification for direct review under § 158(d)(2)(A)(i) is warranted.  (*Id*. at 4.)

      I conclude that certification is inappropriate.  Even if the questions presented were "novel" and "highly important to financial markets," they are not dispositive of the appeal, *i.e.*, the answers will not affect the outcome unless the court hearing the appeal also reverses the Bankruptcy Court's factual findings that the transferors were solvent and received reasonably equivalent value for the

transfers.  *See In re LATAM Airlines Grp., S.A.*, No. 20-11254, 2022 WL 2962948, at *7 (Bankr. S.D.N.Y. July 26, 2022) (declining to certify for direct appeal where the Bankruptcy Court's factual finding made consideration of the challenged legal question unnecessary).  Put another way, the court reviewing the Bankruptcy Court's judgment need not consider the legal questions regarding the applicability of § 546(e)'s safe harbor unless and until the reviewing court determines that the Bankruptcy Court clearly erred in its factual findings.  Such questions do not "fall within the ambit of section 158(d)(2)(A)(i)."  *Id.*; *see also In re Am. Home Mortg.*, 408 B.R. at 44 (declining to certify for direct appeal where the Bankruptcy Court's decision involved "mixed questions that implicate the particular circumstances of this case").

**V.      CONCLUSION**

For the reasons set forth above, the Certification Motion will be denied.  The Court will issue a separate Order consistent with this Memorandum Opinion.

11