**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| SAMSON RESOURCES CORPORATION, | : | Case No. 15-11934 (BLS) |
| | : | |
| Reorganized Debtor. | : | |
| _____ | : | |
| | : | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST, | : | Adv. Pro. No. 17-51524 (BLS) |
| | : | |
| Appellant, | : | |
| v. | : | Civ. No. 23-799 (JLH) |
| | : | |
| SAMSON ENERGY COMPANY, LLC, *et al.*, | : | |
| | : | |
| Appellees. | : | |

J. Christopher Shore, Colin T. West, White & Case LLP, New York, NY; Michael J. Farnan, Farnan LLP, Wilmington, DE

*Counsel for Appellant*

Daniel M. Stern, Samuel M. Kidder, KTBS Law LLP, Los Angeles, CA; Andrew J. Gallo, Nathaniel P. Bruhn, Morgan, Lewis & Bockius LLP, Boston, MA; Bryan Killian, Morgan, Lewis & Bockius LLP, Washington, DC; Michael R. Nestor, Michael S. Neiburg, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE

*Counsel for Appellees*

## **OPINION**

October 17, 2025

**HALL, U.S. DISTRICT JUDGE**

## I.    INTRODUCTION

This appeal arises from the above-captioned adversary proceeding (the "Adversary Proceeding") brought by Peter Kravitz, as Settlement Trustee of the Samson Settlement Trust (the "Trustee") appointed under the plan confirmed in the chapter 11 cases of Samson Resources Corporation and certain of its affiliates (together, the "Debtors").  The Adversary Proceeding sought the recovery of alleged fraudulent transfers arising out of the 2011 sale of Samson Investment Company ("SIC") by its owners to a private equity consortium.  The complaint alleged that the purchasers overpaid for the business, enriching the former owners to the detriment of the company, which took on unsustainable debt as part of the sale and was left inadequately capitalized and doomed to collapse.  Pending before the Court is the Trustee's appeal from the Bankruptcy Court's order, dated July 7, 2023 (Adv. D.I. 482)[1] (the "Final Judgment"), and accompanying opinion, *In re Samson Resources Corp.*, 2023 WL 4003815 (Bankr. D. Del. Jun. 14, 2023) (the "Bankruptcy Court Opinion"), which found that the Trustee had failed to prove both (i) that the post-sale entity was insolvent and (ii) that reasonably equivalent value was not exchanged.  *Id.* at *39.  The Trustee also appeals from two interlocutory orders, issued on January 6, 2021 (Bankr. D.I. 294) and August 23, 2022 (Bankr. D.I. 400) (the "Interlocutory Orders"), which, together, held that certain transfers made by SIC fall within the Bankruptcy Code's § 546(e) safe harbor.

---

[1] The docket of the Chapter 11 case, captioned *In re Samson Resources Corp.*, No. 15-11934 (BLS) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __."  The docket of the adversary proceeding, captioned *Kravitz v. Samson Energy Co., LLC*, Adv. No. 17-51524 (BLS) (Bankr. D. Del.), is cited herein as "Adv. D.I. __."  The Trustee's appendix (D.I. 27-36) in support of his Opening Brief (D.I. 39) ("OB") is cited as "A-[TAB#]," and Appellees' supplemental appendix (D.I. 52-53) is cited as "S__."

For the reasons below, the Court will affirm the Final Judgment without reaching the Trustee's challenges to the Interlocutory Orders.

## II.    BACKGROUND

### A.    Procedural History

Samson Resources Corporation ("SRC")[2] and its affiliates filed voluntary petitions for relief under chapter 11 on September 16, 2015.  After many months of negotiation and litigation, the Bankruptcy Court entered an Order (A-66) confirming the Debtors' plan of reorganization (A-65) (as modified, the "Plan") on February 13, 2017.  Among other things, the confirmed Plan provided for the creation of the Samson Settlement Trust.  The Trust was funded with cash in the approximate amount of $168 million and also received ownership of, and the right to prosecute, certain estate causes of action on behalf of creditors holding Class 5 general unsecured claims under the Plan.

The complaint in this adversary proceeding seeks recovery for alleged fraudulent transfers arising out of the pre-bankruptcy acquisition of SRC by a consortium of equity sponsors led by Kohlberg Kravis Roberts & Co. ("KKR," and collectively with the other equity participants, the "Sponsors"), which closed on December 21, 2011 (the "Sale" or "Transaction").  Defendants are individual members of the Schusterman family and certain family trusts that, before the Sale, owned or held the stock of SIC.  Suit was not brought against KKR or any other Sponsor.

Prior to the trial, defendants filed seven dispositive motions.  (*See* Adv. D.I. 397 at 3-4 (summarizing dispositive motion practice).)   After the Bankruptcy Court's rulings on those motions, several of the original defendants were dismissed from the litigation for a variety of

---

[2] Consistent with the Bankruptcy Court Opinion, this Court will refer to the pre-sale entity, which was owned by the Schusterman family, as "SIC."  The post-sale entity, which was owned by the KKR-led consortium and ultimately filed for bankruptcy relief in 2015, will be referred to as "SRC."

reasons, including being released from liability under the Plan or being protected by the safe harbor provisions of 11 U.S.C. § 546(e). The trial proceeded on three remaining counts against the Appellees: (i) Count I, seeking to avoid and recover certain cash transfers for the redemption or purchase of SIC stock as constructive fraudulent transfers under 11 U.S.C. §§ 544 and 550 and applicable state law; (ii) Count III, seeking to avoid and recover certain asset transfers under 11 U.S.C. §§ 544 and 550 and applicable state law; and (iii) the corresponding claims under Count V seeking the recovery of fraudulent transfers under 11 U.S.C. § 550. *In re Samson*, 2023 WL 4003815, at *3 n.9.

The Bankruptcy Court Opinion summarized the crux of the case: "By paying over twice what he alleges was the fair market value of the company, the [Trustee] contends that the new owners were obliged to burden the Company with more debt than it could service, giving rise to a death spiral that led ultimately and directly to the company's bankruptcy filing in 2015." *In re Samson*, 2023 WL 4003815, at *1. As explained by the Bankruptcy Court:

> The Defendants contend that the sale price negotiated and ultimately paid by KKR and the Sponsors to the Schustermans – approximately $7.2 billion – represented the fair market value of the company at that time. Likewise, the Defendants contend that the consideration provided by the Schustermans essentially to retain the Gulf Coast and Offshore Business[es] [as defined below] represented the fair market value of those assets as part of the Transaction. The Plaintiff responds that KKR and its partners in the acquisition failed to properly vet the Transaction, and ultimately paid far in excess of the $2.7 billion he alleges Samson Onshore [as defined below] was worth. … Plaintiff contends that KKR and the Sponsors were so enthusiastic to do the deal that they ignored obvious red flags and otherwise failed to properly conduct the due diligence necessary to ascertain the true value of SIC before making their bid. He also suggests that the many equity Sponsors and lenders (and their respective professionals) joining KKR in the deal likewise failed to investigate the Transaction either out of deference to KKR's storied reputation, or out of a desire to earn the large fees that would come from a multibillion-dollar deal.

*Id*. at *4.

As explained further below, the central issue in this appeal relates to the value of the Samson Onshore business (as defined below) at the time of the Sale and how that value compares to both the purchase price paid and the debt that Samson was obligated on immediately after the Sale.

### B.    Evidentiary Record

The Trustee's evidence included testimony from three expert witnesses, each of whom provided both written and live testimony: (1) Scott Baxter of Berkeley Research Group, who testified on issues of solvency and valuation; (2) Dr. Richard Strickland, who testified on issues relating to petroleum engineering; and (3) Todd Filsinger of Filsinger Energy Partners, who testified on issues relating to commodity prices and commodity hedging and their relation to SRC's post-Transaction business plan (the "Business Plan") and an appropriate stress or downside case.  The Bankruptcy Court's thorough Opinion contains a full analysis of the record developed at trial by the Trustee.

Appellees called witnesses who submitted both written and live testimony to the Court. Appellees' primary witnesses were Ms. Stacy Schusterman, a fact witness describing the circumstances surrounding the negotiation and documentation of the Transaction; Ms. Suzanne Roski, a valuation expert testifying in rebuttal to the valuation report of Mr. Baxter; and Mr. Steven Almrud, a Managing Director of the Global Energy Group of BRG, with over 30 years of energy investment banking experience, offering testimony about the sufficiency of the sale process and related due diligence, as well as SRC's Business Plan.  Appellees' witnesses did not offer a traditional valuation to counter that presented by the Trustee.  Rather, Appellees focused on presenting the factual record of the negotiations and due diligence efforts, and their case rested

largely on the proposition that the actual sale results provide a more accurate and reliable indicator of SIC's value in 2011 than the Trustee's expert valuation report prepared long after the deal closed. The Bankruptcy Court Opinion also discusses the record developed by Appellees regarding the process employed in negotiating the Sale. Accordingly, the Court repeats here only what helps to understand the discussion.

### 1. The Parties and Their Professionals

Prior to the Transaction, SIC was one of the largest privately held oil and gas exploration and production ("E&P") companies in the United States, holding assets primarily located in the Rocky Mountains, Mid-Continent, and East Texas regions. At the time of the Transaction, SIC owned, among other assets, (i) a substantial portfolio of conventional producing vertical wells and conventional acreage across many major U.S. basins, (ii) a substantial portfolio of producing horizontal wells in unconventional fields, and (iii) millions of net acres of undeveloped, unconventional reserves and resources ("Samson Onshore"). SIC also owned certain interests in exploration projects being undertaken in the Gulf of Mexico (the "Gulf Coast and Offshore Businesses").

Among its substantial oil and gas assets, SIC owned millions of acres of undeveloped, unconventional (or "shale") acreage. (S1996-1997 ¶¶ 14-16; S1917-1918 ¶¶ 25-29.) Aware of the robust market for unconventional assets—Exxon, Royal Dutch Shell, and Chevron had recently made major acquisitions—senior managers at SIC began to explore a potential sale. (S1997-1999 ¶¶ 17-18, 22.) SIC started the process by contacting several investment banking firms in March 2011 and retained Jefferies & Co. ("Jefferies"), which the Bankruptcy Court found to be "among the most experienced investment banking firms in the upstream oil and gas sector, with particular familiarity and experience in unconventional assets." *In re Samson,* 2023 WL 4003815, at *5.

Jefferies' preliminary analysis in March 2011 (S0449) showed an implied valuation range for the entire company of between $7 to $10 billion. *Id.* Jefferies' ensuing valuations up to and through the summer of 2011 consistently fell within this same range. *Id.* Jefferies, however, advised SIC that the Gulf Coast and Offshore Businesses would be less interesting to buyers in the current market because they involved conventional producing assets, exploration drilling, and speculative seismic shoots, making them uncertain and capital-intensive. *See id.* at n.29.

Jefferies assembled a core deal team of 14 professionals (S0708) and worked with SIC to build a virtual data room ("VDR") where potential purchasers could access information on SIC and its assets. (S2043 ¶ 89; A-76 ¶ 24.) The VDR, with over 1,000 folders and files, had asset-specific data, organized by region, that included technical, commercial, marketing, and financial documents. (S2043-2046 ¶ 90.)

Jefferies designed a process with two phases: in the first, interested parties could conduct initial due diligence and submit bids or expressions of interest; in the second, it was expected that an exclusivity arrangement would be signed with the most promising bidder, who would then conduct deeper due diligence leading up to the potential closing of a deal. *In re Samson,* 2023 WL 4003815, at *6. Five entities signed non-disclosure agreements ("NDAs")—including Apache Corporation ("Apache"), Korea National Oil Corporation ("KNOC"), and KKR—and they were afforded access to the VDR to conduct initial due diligence.

Founded in 1976, KKR is a leading global investment firm with a strong reputation in the oil and gas industry. *In re Samson,* 2023 WL 4003815, at *6. KKR was well positioned to evaluate SIC's assets.[3] Before the Sale, KKR had "completed more than 175 private equity investments

---

[3] KKR's experienced internal team included the following individuals: Marc Lipshulz, "the global head of energy and infrastructure"; Jonathan Smidt, "a principal in the energy group"; Henry Kravis and George Roberts, two of the founders of KKR; and Ash Upadhyaya, a trained petroleum engineer who oversaw the construction of the financial model that KKR used in

with a total transaction value in excess of $430 billion," (A-41, BARC_001430), including successful investments in energy and infrastructure. (*See* S1766; S0496.)  Moreover, in November 2010, approximately a year before bidding on SIC, KKR had announced a partnership with RPM Energy LLC ("RPM"), a company with deep experience and resources in the oil and gas industry. The stated purpose of this partnership was for RPM to assist KKR in the evaluation and development of unconventional acreage.  RPM's leaders, Claire Farley and David Rockecharlie, had extensive experience as executives in the oil and gas industry, with over 100 transactions each, and their team was composed of numerous oil and gas professionals, including geologists, engineers, and individuals who were formerly in E&P operations.  (S2040-2042 ¶ 81 (Table 10); A-15 at 13:21-21:18; S0046-0047 at 181:11-182:24, 184:11-185:4.)   In an October 25, 2010 press release announcing its joint venture with RPM, KKR said that it would, through the joint venture, target large unconventional plays and extend KKR's oil and gas strategy.  Thus, in early 2011, as SIC was exploring a sale, KKR was seeking shale opportunities.  *In re Samson,* 2023 WL 4003815, at *6.

Pre-bid, KKR and RPM focused on Samson's undeveloped acreage, studying maps, type curves, historical well performance, and other technical data.  (S2050 ¶ 110(a); S0613-0614.)

### 2.    KKR's Bid, Due Diligence, and Deal Model

In September 2011, three of the parties that had conducted preliminary diligence submitted written bids: Apache, KKR, and KNOC.  Apache offered $8.8 billion for the entire company (including the Gulf Coast and Offshore Businesses), consisting of $8.11 billion in cash, or in a combination of cash and Apache common stock, and the assumption of approximately $700 million in debt.  KNOC submitted a bid of $5.5 billion for the entire company.  KKR submitted its

---

connection with the Transaction and performed quality control of the model on behalf of KKR.  *In re Samson,* 2023 WL 4003815, at *7.

bid on or around September 19, 2011 (the "KKR Bid"), offering $7 billion for the stock of SIC, with the proviso that the Gulf Coast and Offshore Businesses would not be acquired. *In re Samson,* 2023 WL 4003815, at *7. Ms. Schusterman testified that she regarded a potential KKR acquisition favorably for several reasons, including that KKR's proposal would preserve jobs, provide for the company to remain headquartered in Tulsa, and provide an opportunity for the Schustermans to remain involved in the oil and gas industry by retaining the Gulf Coast and Offshore Businesses. Ultimately, negotiations proceeded with the KKR Bid. *See id.* Post-bid, KKR and RPM performed "deep technical diligence" involving multiple teams of professional advisors. (S0613.)

The Deal Model was a massive Excel worksheet that, among other things, projected future development and volumes of oil and gas production, along with associated costs. Based on assumptions as to commodity prices, the Deal Model developed future cash flow projections used to evaluate the Sale. (S2023 ¶ 42.) It was "sophisticated, complex, dynamic, and well-organized" and "allowed KKR to quickly and efficiently update a large number of inputs and assumptions within the Deal Model, and to run multiple sensitivities." (S2023-2024 ¶ 43.) The Deal Model allowed KKR to forecast cash flows and update those forecasts based on data provided by SIC, Jefferies, and KKR's advisors throughout the diligence process. (S2062 ¶ 145.) The Deal Model was the basis for the Business Plan. From August 2011 through December 2011, over 100 iterations of the Deal Model were created. (Almrud Decl. ¶ 150; Trial Tr. (Almrud) 1965:20-21.) Mr. Upadhyaya, a petroleum engineer and KKR employee, provided constant quality assurance and control of the Deal Model, ensuring "that it was functioning properly ... [and] to make sure that the Model reflected ... the group's view of what should go into the model." (A-16, Upadhyaya Dep. 30:21-31:8.) "Deloitte also review[ed] the Model, just to make sure there was another set of

eyes that looked at the Model and nothing was missed ... [and] it passed the QA/QC of Deloitte as well." (*Id.* 234:5-16.)

The Business Plan, as reflected in the Deal Model, presumed that existing management and field personnel, who best understood Samson Onshore, would stay on after the sale. (A-15, 75:7-76:9.) KKR, RPM, and SIC reviewed the Business Plan together, including an in-depth review of the proposed drilling schedule. (A-7 at 1570:24-1571:6; S0558; S0613.) SIC management's buy-in to the Business Plan was critical to KKR—ultimately, they agreed on the Business Plan. (A-15 at 77:18-78:11, 227:18-228:8.)

RPM independently prepared the volume estimates for Samson Onshore's undeveloped, unconventional acreage used in the Deal Model. RPM divided Samson Onshore's undeveloped assets into 13 areas and 92 subareas. (S2060 ¶ 140.) For each, RPM independently evaluated the number and location of wells, the estimated recovery from each, and the rate of that production, expressed as a "type curve." (S2069 ¶ 171; S204-0205, 0211-0212 (61:23-62:5, 89:24-91:23).) RPM relied on SIC's production and subsurface data, results from other operators, and published information. (S2069-2070 ¶ 172; S0811.) RPM then risked production based on many risk factors, including public and private production data, well spacing and depth, and subsurface, topographical, and regulatory considerations. (S0811; S2077-2078 ¶ 193.)

RPM developed the drilling plan based on the historical pace of drilling, seasonal regularity, third-party operator activity, and organizational capability. (S2084 ¶ 206; S0217, 112:8-113:23.) Mr. Almrud reviewed the schedule and opined that it was reasonable and developed consistent with industry standards. (S2085 ¶ 208.)

To test the Deal Model, KKR ran stress cases, which assumed both lower volume projections and lower pricing. (S2082, 2104-2105 (¶¶ 201, 267-270); A-9 at 2014:1-13.) The

volume projections were reasonably stressed by risking certain areas more heavily than in the base case. (S2082 ¶ 201.) The stress case KKR most widely shared with investors assumed flat commodity prices of $3.00/MMBtu for gas and $70.00/Bbl for oil through the first five years, with 1.5% annual escalation thereafter. (S2094 ¶ 241; A-9, 2017:17-2018:2.) Historically, gas prices had not had a sustained period below $4.00 since 2001-2004 (S2028-2029 ¶ 60 (Table 4)), and while gas spot prices had experienced a decline in the second half of 2011, the market evidence demonstrated that it was reasonable to assume that gas prices could soon rebound. (S2095 ¶ 245; *see also* S0133, 63:24-64:15 (Crestview "felt that for an extended period of time for gas to be below 3.50 would be highly unlikely.").) The gas stress prices used by the lenders, who financed the Sale with $3.595 billion of debt, were significantly above the $3.00 KKR stress price. (S2101-2103 ¶¶ 260-264.)

### 3.    Other Participants' Due Diligence

The Transaction contemplated that the equity Sponsors led by KKR would pay approximately $4.145 billion of cash equity; the Sponsors planned to finance the balance of the purchase price by raising $3.595 billion of debt from a consortium of lenders (the "Participating Lenders"), comprising twenty-four Wall Street banks, led by JPMorgan, and including Barclays, Bank of Montreal, Citibank, Credit Suisse, Goldman Sachs, Morgan Stanley, RBC, and UBS— lenders who "were all deeply experienced in oil and gas lending and trading." *In re Samson,* 2023 WL 4003815, at *13. (*See* S2160-2161 ¶ 29; S2111 ¶ 287.)

The KKR-led group of equity Sponsors included three other investors—Crestview Tulip Investors LLC ("Crestview"), Natural Gas Partners ("NGP") and Itochu Corporation ("Itochu")— which contributed approximately $1.89 billion of the equity consideration paid for SIC. The evidentiary record developed at trial reflects that Crestview, NGP, and Itochu each performed their

own substantial and independent due diligence on SIC and reached their own conclusions of value that supported the Transaction, as did the Participating Lenders. *See In re Samson,* 2023 WL 4003815, at \*10-12 (findings on the co-Sponsors' diligence process); *id.* at \*12-14 (findings on the Participating Lenders' diligence process).

Crestview, a private equity firm, contributed $350 million in equity. (S1737; S0122 at 21:13-18.) TPH, an investment bank specializing in oil and gas, advised Crestview. (S0127 at 40:4-41:18; S0576; S0591.) Crestview's diligence was "rigorous" and "thorough" (S0123 at 23:22-24:9), and Crestview modeled the investment independently, running its own operating and risking assumptions, including assumptions that were more conservative than KKR's. (S0582-0584; S0591; S0619.) Crestview analyzed commodity-pricing risk and Samson Onshore's projected debt structure, concluding that "due to Samson's base of cash flows generated by the producing reserves, we believe the Company will be able to weather a prolonged low commodity price environment." (S0590.)

NGP, an energy-focused private equity firm, contributed $500 million in equity. (S1737.) NGP performed extensive due diligence, conducting a "detailed review of due diligence and technical work" performed by RPM; and holding due diligence meetings with third-party advisors to KKR. (S0695.) NGP's confidence in SIC's business was bolstered by the fact that some of NGP's most successful portfolio companies were led by SIC alumni and operated in the same basins as Samson Onshore. (S0660.) NGP prepared its own valuation, including risking Samson Onshore more heavily than KKR. (S0664-0693.)

Itochu, a Japanese strategic investor, contributed $1.04 billion in equity. (S1723.) Itochu also engaged oil and gas professionals to assist in its review and analysis of SIC. (S1701; S1703.)

11

As discussed, the Participating Lenders financed the balance of the purchase price with $3.595 billion of debt, comprising a $2.25 billion reserve-based revolving credit facility ("RBL") (of which $1.35 billion was drawn at closing) and a $2.25 billion unsecured loan ("Bridge Facility"). (S1712.) The parties contemplated that the Bridge Facility would be refinanced in early 2012 (S0897), but, as of the Closing Date, the Participating Lenders had no assurance that would happen. The record reflects that their diligence was extensive. For example, JPMorgan had a team of at least 24 individuals, including an in-house petroleum engineer. (S0716-0718; S0268; S0271 at 18:21-19:5, 33:11-24).) Bank of America, N.A.'s diligence included a 22-member team. (S0701.)

The Sponsors prepared extensive analyses to assess whether Samson Onshore would "be conservatively capitalized to fund its drilling plan with cash flow from existing reserves and production" and would have "resilience in weak commodity price environments," ultimately concluding that it was. (S0756, S0768.) NGP indicated that the "[c]onservative debt ratios and light covenants with long-term debt will provide runway for development and value creation. This is not a typical leveraged buyout." (S1706.)

Appellees' valuation expert Suzanne Roski credibly opined that the Business Plan provided sufficient cushion to withstand reasonable downside scenarios. (S2206-2212 ¶¶ 162-176.) SRC's leverage was comparable to its peers, and it had adequate access to capital to fund its operations and service its debts post-Sale. (S2214-2215, 2218-2220 at ¶¶ 181-185; 188-194). Appellees' expert, Shane Randolph, who filed a declaration and testified at trial in response to the expert reports put forth by the Trustee, also prepared various scenarios with different hedging and downside price assumptions showing that the Deal Model yielded positive cash flows and equity returns. (S1940-1941 (Randolph Decl.) at ¶¶ 25-26.)

### 4.    The Transfer of the Gulf Coast and Offshore Businesses

As the Sponsors did not want to purchase the Gulf Coast and Offshore Businesses, the parties agreed that, before the Sale, SIC would transfer these businesses to Samson Energy, a new company formed by the selling shareholders.  (*See* A-43, SEC-00249950-57.)  In exchange, Samson Energy would transfer certain notes originally made by SIC to its shareholders ("Shareholder Subordinated Notes")—with a combined principal amount of $553 million—to SIC and they would be cancelled.  (A-76, ¶ 37; *see also* A-43, SEC-00249952; S2008 ¶¶ 54-55; S1893-1894 ¶ 26; S1878; S1867-1869; S1870-1872; S1873-1877.)

At the time of the Sale, two independent appraisals valued the Gulf Coast and Offshore Businesses at less than the principal amount of the Shareholder Subordinated Notes.  (S1901 ¶ 56.)  Duff & Phelps valued the Gulf Coast and Offshore Businesses as of December 1, 2011 at $445 million, and Stout Risius Ross, LLC ("SRR") at $459 million.  (A-52, DP_Samson_0001304-05; A-53, SEC-00276726.)

In the end, the process that Jefferies initially estimated would be a 14-week diligence period extended to 19 weeks.  (S0468.)  The time spent on diligence was typical for a transaction of this size.  (S2049 ¶ 105.)  KKR and RPM testified that the Sponsors had adequate time to complete technical diligence, and that it was thorough.  (*See, e.g.*, A-16, 91:22-93:6; S0218, 114:4-115:12.)

### 5.    SRC's Post-Sale Performance

In the years after the Sale, SRC faced headwinds neither known nor reasonably foreseeable at the time of the Sale, ultimately resulting in SRC's bankruptcy.  Contrary to market expectations, commodity prices fell after closing.  Natural gas prices fell 40% in the four months post-closing and remained at historically low levels.  (S2223-2224 ¶¶ 201-203.)  Most significantly, oil prices crashed in 2014 following OPEC's decision to maintain production levels, resulting in the longest

sustained collapse of oil prices in history.  (S2224 ¶ 204.)  While oil had traded around $100 per barrel at the time of the Sale, by late 2014, it had dropped into the $40s.  (S2247 ¶ 42.)  Phil Cook, SRC's CFO post-Transaction, testified in his First Day Declaration that "[a] number of unexpected and unprecedented challenges" led to the bankruptcy filing, including dramatic and continuing commodity price declines.  (S2232 ¶ 4.)  Other executives at SRC agreed with the leading impact of pricing.  (*See* A-23 at 42:14-43:4; S0077-0078, 305:8-306:23; A-15 at 149:3-11, 258:2-260:20.)

Those difficulties were experienced industrywide, refuting the contention that SRC faced unique issues caused by the Sale.  (S2248-2249 ¶¶ 44-46; *see also* S1357.)  Indeed, at least 167 E&P companies filed for bankruptcy from 2015 to 2018.  (S2225 ¶ 206.)  Filings in those cases repeatedly referenced the "historical," "extreme," and "severe" decline in commodity prices.  (*Id.*)

Despite these headwinds, the Sponsors, SRC, and the market believed that SRC had positive equity value and was adequately capitalized for years after the sale.  From 2012 through early 2014, the Sponsors placed positive values on their equity in SRC.  (*See, e.g.*, S1200; S1763; S1771; S1273; S1774; S1776; S1780; S1857; S1312-1313.)

At trial, Mr. Almrud testified that the Deal Model, Business Plan, and cash flow projections were reasonable and prepared consistent with industry standards.  (S2017, 2068-2069, 2075, 2077, 2084-2085, 2093 (¶¶ 20, 165, 170, 183, 191, 204, 208, 211, and 236.)

### 6.    Alleged Flaws in the Deal Model

The Trustee's evidence included testimony from three expert witnesses setting forth what they believed were deep flaws in the Business Model.  The Trustee's valuation expert, Mr. Baxter, prepared a report setting forth his opinions that SRC was insolvent as of the closing date of the Sale, and (ii) the fair market value of the assets acquired in the Sale was not reasonably or even remotely equivalent to the fair market value of consideration paid by the Sponsors.  (A-61, Baxter

Decl. ¶¶ 9-10.)  Addressing the significant gap between the amount paid to the selling shareholders and Mr. Baxter's valuation of Samson Onshore, the Trustee submitted evidence to detail the "fatal flaws" that his witnesses found in the Deal Model or Business Plan.

Central to the alleged flaws, the Trustee contended that KKR failed to follow industry standards in performing the three steps required to value SRC under the NAV Method:[4] (i) categorizing reserves and resources to identify different levels of uncertainties in their extraction; (ii) estimating volumes and cash flows (based on reasonable pricing assumptions) for the various reserve categories; and (iii) applying appropriate risk factors to the resulting cash flows.

As to the first step—categorizing reserves and resources to identify different levels of uncertainties in their extraction—the Trustee argued that the Deal Model did not classify Samson Onshore's undeveloped assets according to Petroleum Resources Management System ("PRMS") guidelines.  *In re Samson,* 2023 WL 4003815, at *18.  PRMS provides a set of industry-accepted standards and definitions for use in valuing oil and gas assets.  These assets fall broadly into categories defined as Proven, Probable and Possible.  A report that analyzes all three of those categories is called a 3P report; and a report that only looks to Proven reserves is called a 1P report. *Id.* at * 27.  Petroleum engineers developed PRMS as a framework to classify oil-and-gas reserves and resources based on the likelihood of recovering estimated quantities of oil and gas from a well. Dr. Strickland asserted that PRMS was industry standard at the time.  *Id.* at *18.  Before the Sale's closing, KKR and the Sponsors commissioned Netherland Sewell & Associates, Inc. ("NSAI") to provide them with a 1P report.  *Id.* at *20.  It was anticipated that NSAI would prepare a 3P report,

---

[4] The Trustee contended that the Net Asset Value Method ("NAV") is the best way to value an E&P company because it focuses on the fundamentals of the E&P business—locating and digging wells to extract hydrocarbons—and accordingly determines an E&P company's fair market value based on the risk-adjusted valuation of the company's reserves and resources that can be extracted.  *In re Samson,* 2023 WL 4003815, at *18 n.175.

but not until after the Sale's closing.  Mr. Baxter and Dr. Strickland contended that a 3P report was a critical element of due diligence, and that the failure to obtain such a report was a glaring error that deeply tainted the sale process.  *Id.* at *28.

"In lieu of PRMS," the Trustee contended, "the Sponsors reviewed the work of Samson's management and bankers and developed their own custom-made, and deeply flawed, system for predicting what cash flows Samson could realize from its undeveloped acreage.  (A-2 at 320:9-325:4.)  As Dr. Strickland testified, "the undeveloped volumes [in the Model] are overstated due to the methodology and the assumptions that were used" and these "vastly overstate[d]" volumes "flow straight through to the values."  (*Id.* 311:12-312:2; 285:20-286:10, 348:23-349:4.)  Critically, the Trustee's experts opined, the Deal Model's overstated volume assumptions were compounded by an aggressive operational plan that was predicated on successfully extracting the assumed volumes from previously-undeveloped acreage.  (OB at 13.)  As the Trustee's valuation expert, Mr. Baxter, testified at trial, the cash flows in the Deal Model were overwhelmingly to be derived from new well production post-closing, with projected EBITDA just from wells drilled post-closing rising from $358 million in year one, to $2 billion by year five.  (A-61, Ex. A at ¶¶ 66-68, 163-165, Tables 12-13, 24; A-56 at "Projections" worksheet; A-4 (Baxter), 781:10-782:4; A-62 at 43.)  Thus, each year's new drilling would necessarily be funded by reinvesting the cash generated by the prior year's performance, which itself was to come largely from the exploitation and sale of those speculative previously undeveloped assets.  (*See id.*)  "It was therefore critical for the Model to be built on an accurate estimate of Samson's reserves based on a reliable, industry-standard methodology"—but, as the Trustee's experts opined, it was not.  (OB at 13.)  According to the Trustee, "[t]he flaws in the Model manifested near-instantly upon closing," and, as a direct result of the Business Plan's flaws, Samson became mired in a "death spiral" from which it could

not recover.  (*Id.* at 14-15 (citing A-1 (Filsinger) at 79:7-20; A-16 (Upadhyaya Dep.) 49:2-9; A-59, Ex. A at ¶ 18.)

Evidence at trial, however, showed that market participants at the time of the Sale assessed and priced unconventional, undeveloped assets—like the assets here—without reliance on PRMS guidelines.  Appellees asserted that PRMS was not developed for unconventional or "shale" acreage—the majority of Samson Onshore.  (A-2, 441:10-19.)  Appellees asserted that, at the time of the Sale, the industry was only beginning to determine whether and how to apply the PRMS framework to unconventional assets.  (*Id.* 446:23-447:2.)  Mr. Almrud testified that:

> Market clearing valuations in transactions involving undeveloped, unconventional acreage done at the time of the [Sale] were not based on PRMS guidelines. The risk profile of unconventional acreage did not align with the PRMS guidelines, and buyers and sellers in transactions involving unconventional resources generally did not use PRMS guidelines for valuing unconventional, undeveloped assets and creating business plans for those assets.

(S2048-2049 ¶ 101.)  Mr. Almrud further testified that, in his experience, using PRMS guidelines would produce a valuation for undeveloped, unconventional assets dramatically below the value that the market would place on those assets.  (S2118-2119 ¶ 312.)

### D.    The Trial and the Final Judgment and Opinion

The Bankruptcy Court presided over a three-week trial in 2022.  Pursuant to a pre-trial order, the parties agreed to a statement of stipulated facts, which was admitted into evidence without objection.  The Court also accepted into evidence 32 deposition transcripts and 1130 trial exhibits.  Following the close of evidence in late September 2022, each side prepared and filed comprehensive proposed findings of fact and conclusions of law.  Closing arguments occurred over the course of a full day on December 8, 2022.

The Trustee sought to recover alleged constructive fraudulent transfers arising from the Sale under § 544(b) of the Bankruptcy Code, which allows a trustee to avoid a transfer of property of the debtor "under applicable law" (11 U.S.C. § 544(b)(1)), in this case, Delaware law. Under Delaware's Uniform Fraudulent Transfer Act ("UFTA"), a plaintiff asserting a constructive fraudulent conveyance must satisfy two elements to prevail: (i) that the transferor was insolvent at the time of, or was rendered insolvent by, the transfer; and (ii) that the transferor failed to receive reasonably equivalent value for the assets transferred. *See* 6 Del. Code §§ 1304(a)(2), 1305(a).

On June 14, 2023, the Bankruptcy Court issued its 74-page Opinion containing its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. Ultimately, the Bankruptcy Court found that neither the $7.1 billion payment for Samson Onshore, nor the transfer of the Gulf Coast and Offshore Businesses in exchange for cancellation of the Shareholder Subordinated Notes, represented a fraudulent transfer. In reaching its conclusions, the Bankruptcy Court found that the Trustee (i) did not prove that the post-sale entity was insolvent at the time of the sale and (ii) did not prove that reasonably equivalent value was not exchanged for either transfer.

On July 21, 2023, the Trustee filed his Notice of Appeal with respect to the Final Judgment as well as the Interlocutory Orders. (D.I. 1.) On October 17, 2023, the Trustee filed a motion (the "Certification Motion") seeking certification of a direct appeal to the United States Court of Appeals for the Third Circuit, under 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8006(f), of the Final Judgment and the Interlocutory Orders. (D.I. 26.) This matter was reassigned to me on January 8, 2024. On May 23, 2024, I issued a Memorandum Opinion and Order denying the Certification Motion. (D.I. 64, 65.) The merits of the appeal are fully briefed. (D.I. 27, 51, 55.) No party requested oral argument.

18

III.    **JURISDICTION AND APPLICABLE STANDARDS**

This Court has jurisdiction over appeals from "final judgments, orders, and decrees" of the Bankruptcy Court.  28 U.S.C. § 158(a).

The Bankruptcy Court's determinations with respect to insolvency and reasonably equivalent value in connection with a fraudulent transfer analysis "are mixed questions of law and fact." *In re R.M.L.*, 92 F.3d 139, 147 (3d Cir. 1996).  "Thus, while the factual findings underlying those determinations are reviewed only for clear error, [] review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts is plenary." *Id.* (internal citations and quotations omitted).

As for the first UFTA element of whether the transferor was solvent on the date of the transfer, there are three applicable tests for solvency: the Balance Sheet Test; the Capital Adequacy Test; and the Cash Flow Test.[5]  *See In re Samson,* 2023 WL 4003815, at *30.  The Trustee challenges the Bankruptcy Court's application of the Balance Sheet and Capital Adequacy Tests. (*See* OB 22-39.)  Both are highly fact-intensive.

The Court "exercises plenary review over a [lower] court's selection of a valuation standard." *In re Hechinger Inv. Co.*, 147 F. App'x 248, 251 (3d Cir. 2005).  "Once a standard is applied, a valuation is a question of fact that this Court reviews only for clear error." *Id.*

---

[5] Insolvency can be shown in by either: (i) the sum of the debtor's debts is greater than all of the debtor's assets ("Balance Sheet Test") (*id.* §§ 1302(a), 1305(a)); (ii) the debtor was engaged, or was about to engage, in a business or transaction for which any property remaining with the debtor was unreasonably small capital ("Capital Adequacy Test") (*id.* § 1304 (a)(2)(a)); or (iii) the debtor intended to incur, or believed (or reasonably should have believed) it would incur, debts beyond its ability to pay as such debts matured ("Cash Flow Test") (*id.*, § 1304(a)(2)(b)).

## IV.    ANALYSIS

According to the Trustee, "the Appeal presents a straightforward question of law: Is a leveraged buyout, which places billions of dollars of new debt on a company and ultimately leads to its bankruptcy, immune from constructive fraudulent transfer challenge simply because the parties conducted due diligence and transacted at arm's length?"  (OB at 1.)  The Trustee contends that the Bankruptcy Court answered "yes" and that was wrong as a matter of law.

The problem for the Trustee is that his statement of the issue on appeal rests on at least one fundamentally incorrect premise: that the Bankruptcy Court held (expressly or implicitly) that due diligence and arm's-length dealing "immun[ize]" a transaction from being considered a constructive fraudulent transfer.  (OB at 4.)  There may be good arguments for why those circumstances should mean that a transfer can't be constructively fraudulent under the UFTA.  But the Court doesn't need to go there because the Bankruptcy Court did not make such a broad proclamation.  All it found was that this particular transaction was not a constructive fraudulent transfer.  That conclusion was not legally wrong or factually erroneous, and so it will be affirmed.

There is no dispute that the Trustee needed to prove two elements to show a constructive fraudulent transfer: (i) that the transferor was insolvent at the time of, or was rendered insolvent by, the transfer; and (ii) that the transferor failed to receive reasonably equivalent value for the assets transferred.  *See* 6 Del. Code §§ 1304(a)(2), 1305(a).  As to the first element, the Trustee challenges the Bankruptcy Court's application of the Balance Sheet and Capital Adequacy Tests to show insolvency.  The Court takes each test in turn.

A.    **The Balance Sheet Test: The Bankruptcy Court Committed No Clear Error in Finding SRC Was Balance Sheet Solvent**[6]

A company is balance-sheet solvent if the value of its assets exceed its liabilities.  No one disputes that the valuation standard used by the Bankruptcy Court—the fair value of SRC as a going concern (*i.e.*, fair market value)—was appropriate.  Fair market value is a basic economic concept.  "According to the classic formulation, 'fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"  *Amerada Hess,* 517 F.2d at 83 (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973)).

The parties did not dispute that SRC's total debt as of the closing date was the $3.595 billion it incurred in connection with the sale.  So the question the Bankruptcy Court needed to answer was whether the fair market value of Samson Onshore was more or less than that amount on the closing date.  Appellees asserted that the fair market value was $7.587 billion, calculated as the sum of (i) $7.108 billion (the price paid for SIC's stock on the closing date), and (ii) $479 million in net debt refinanced through the sale.  Appellees thus claimed that SRC was solvent as of the Closing Date with an equity value (*i.e.,* solvency cushion) of $3.992 billion.

The Trustee, on the other hand, presented the expert testimony of Mr. Baxter, who used certain valuation methodologies to calculate the fair market value of SRC.  Mr. Baxter opined that the fair market value of SRC's liabilities exceeded the fair market value of its assets by approximately $1 billion.

---

[6] Immediately following the sale, SRC had no material assets other than the stock in SIC. Both SIC and SRC were obligated on the debt that was incurred in connection with the transaction. Accordingly, if SRC was solvent post-sale, then SIC was also solvent at all relevant times.

The Bankruptcy Court Opinion walked through the evidence presented at trial and ultimately concluded that the Trustee failed to prove that SRC was balance sheet insolvent. This Court sees no error in that finding. Contrary to the Trustee's suggestion on appeal, there was nothing wrong with the Bankruptcy Court affording higher evidentiary weight to how KKR and the Sponsors contemporaneously valued the company, especially given their "extensive experience in oil and gas investments" and their "extensive due diligence." *In re Samson,* 2023 WL 4003815, at *31. Nor was it error for the Bankruptcy Court to make the common-sense observation that adopting the Trustee's position would have required the court to find that the Sponsors—sophisticated parties advised by sophisticated parties—made a $4.1 billion cash equity investment of their own money that was "worthless the minute the Transaction closed." *Id.* at *31.

On appeal, the Trustee attempts to cast the Bankruptcy Court's credibility evaluations and weighing of the evidence as reflecting legal error, but the Trustee mischaracterizes the Bankruptcy Court's thorough Opinion. The Bankruptcy Court did not hold that the deal price reflects fair market value in every case, nor did it hold that evidence of due diligence immunizes a deal from challenge under the UFTA. Instead, the Bankruptcy Court found that, ***in this case***, the deal price was more persuasive evidence of the actual market value of SRC than the opinions of the Trustee's experts (acting with a decade of hindsight).[7]

---

[7] The Trustee's briefing on appeal repeats a phrase from the Introduction of the Bankruptcy Court Opinion—that "value is ***fixed and conclusively established*** by the price paid at closing," *In re Samson,* 2023 WL 4003815, at *1 (emphasis added)—in support of his argument that the Bankruptcy Court held that purchase price was always "conclusive" of market value. (*See* OB at 2, 20, 24, 27; *see also* OB at 33 (arguing that "Purchase Price is not conclusive evidence of market value.")). Having reviewed the entirety of the 74-page Opinion, this Court is satisfied that the Bankruptcy Court held no such thing. Instead, the Bankruptcy Court made the entirely appropriate observation that purchase price can, depending on the circumstances of the deal, be better evidence of fair market value than the subjective, hindsight opinion of a litigation expert.

The Trustee accuses the Bankruptcy Court of not "engag[ing] with the substance of" the Trustee's expert opinions.  (OB 29.)  This Court disagrees.  The Bankruptcy Court Opinion addressed the testimony of the Trustee's experts at length.  But, in the end, the Bankruptcy Court found those opinions unpersuasive because, "influenced by hindsight," they were "less reliable than a closed sale by market participants."  *In re Samson,* 2023 WL 4003815, at *1; *see id*. at *29 (finding that the Trustee's experts' opinions, made "with the benefit of hindsight and for the purpose of litigation," amounted, "at best, to the expressions of the witness's disagreement with fair market value").  That the Bankruptcy Court gave little weight to the Trustee's expert testimony is neither an error of law nor a "summary rejection of [the Trustee's] valuation case," as the Trustee asserts.  (OB at 27.)

In short, the record contains ample evidence to support the Bankruptcy Court's finding that, in this case, the purchase price represented fair market value, and that SRC was therefore balance sheet solvent.

### B.   The Capital Adequacy Test: The Bankruptcy Court Committed No Clear Error in Finding SRC Adequately Capitalized

The Trustee acknowledges that whether an entity has adequate capitalization largely turns on whether the "'parties' projections were reasonable at the time of the transaction.'"  (OB at 35 ((quoting *In re PWS Holding Corp*., 228 F.3d 224, 234 (3d Cir. 2000)).  It is a fact-intensive analysis, which looks to whether projections were "prepared in a reasonable manner, using supportable assumptions and logically consistent computations."  *In re Iridium Operating LLC*, 373 B.R. 283, 348 (S.D.N.Y. 2007) (citation omitted).

Here, the projections for Samson Onshore were embodied in the Business Plan.  "[A]fter a comprehensive review of the copious record before it," the Bankruptcy Court found that "the Business Plan for Samson Onshore developed by the Deal Model and tested in the 'deal

marketplace' was reasonable and prudent at the time of the Transaction." *In re Samson,* 2023 WL 4003815, at *36. That factual finding finds support in the record and is not clearly erroneous.

According to the Trustee, the Bankruptcy Court erred by accepting the Business Plan simply because it was adopted by the transaction participants, "without independently assessing the objective, substantive reasonableness of those determinations." (OB at 34.) On the contrary, the Bankruptcy Court Opinion contained several pages of fact-finding to the creation of the projections, including the extensive technical due diligence, area-by-area "deep dives," risking, and considered assumptions that supported the projections. *See In re Samson,* 2023 WL 4003815, at *7-10. The Bankruptcy Court found credible Mr. Almrud's testimony that the Business Plan, related cash flow projections, and assumptions embedded in the Deal Model were reasonable and prepared consistent with industry standards. *See id.* at *36. The Bankruptcy Court further considered the Sponsors' backing of the Sale with their own capital, *see id.* n.318—a fact highly probative of the Deal Model's reasonableness. *See Iridium*, 373 B.R. at 348 ("Courts further recognize that '[a] powerful indication of contemporary, informed opinion as to value comes from private investors who '[w]ith their finances and time at stake, and with access to substantial professional expertise, [ ] concluded at the time [ ] that the business was indeed one that could be profitably pursued.'") (citation omitted).

The Trustee suggests that it was error for the Bankruptcy Court to give weight to the Deal Model because it was not created by management. (*See* OB at 36-38.) But there is no rule that courts can consider only management-created projections. *See, e.g.*, *Moody v. Security Pac. Bus. Credit*, 971 F.2d 1056, 1073 (3d Cir. 1992) (finding adequate capitalization based upon projections prepared by the buyer and a credit analyst for a lender). And it was not error for the Bankruptcy Court to give weight to projections prepared by those with relevant knowledge, like the

24

experienced and sophisticated oil and gas professionals at KKR and RPM who developed the Deal Model.  Moreover, the record here supports a finding that the projections were vetted by SIC's own management team (most of whom stayed on to become SRC's new management).

The Trustee maintains that the Bankruptcy Court wrote only a "one paragraph analysis of capital adequacy" and did "not even mention" the testimony of the Trustee's experts.  (OB at 35-37.)  But that ignores the Bankruptcy Court's thorough discussion of the experts' critiques of the Deal Model, *see In re Samson*, 2023 WL 4003815, at *20-22 ("Opinions regarding the Deal Model's Flaws"), as well as the thorough "Capital Adequacy Test" section contrasting the Trustee's experts' opinions on capital adequacy with Appellees' counter-evidence, including expert testimony about the reasonableness of the Business Plan, *see id*. at *31-36.  The Bankruptcy Court Opinion closely examines Mr. Filsinger's opinions, which primarily focused on hedging, and the contrary opinions offered by Appellees' expert, Mr. Randolph, who determined that the hedging assumptions in the Deal Model were reasonable.  *See id.*  Contrary to the Trustee's arguments on appeal, the Bankruptcy Court did not "fail[] to engage with" Trustee's evidence or "ignore[]" it.  (OB at 39-40.)  It was only after a "comprehensive review" of the "copious record" and "conflicting evidence" that the Bankruptcy Court concluded that the Business Plan "was reasonable and prudent at the time of the Transaction."  *In re Samson*, 2023 WL 4003815, at *36.

The Trustee also ignores other factors cited by the Bankruptcy Court that support its capital adequacy finding, including that (1) SRC did not file for bankruptcy until nearly four years after the closing date (*id*. at *35, n.312 (citing cases basing capital adequacy determination on much shorter periods)); (2) SRC had access to "significant additional capital post-Closing" (*id.*); (3) SRC managed to raise significant debt post-closing, including the $2.25 billion in unsecured notes in

February 2012 that traded well over par into 2014 (*id.*); and (4) the investors and those running SRC all believed that it had positive equity value for years following the closing (*id.* n.313).

In sum, the Trustee's challenges to the capital adequacy finding are purely factual. As the record contains ample evidence to support the Bankruptcy Court's conclusion that SRC was adequately capitalized, those challenges fail.

## V.    CONCLUSION

Because the transferors here were neither insolvent nor inadequately capitalized, the Court need not address the other questions presented in this appeal, including whether reasonably equivalent value was exchanged in the Gulf Coast and Offshore Businesses transaction, the scope of the Plan's release, and whether the safe harbor in 11 U.S.C. § 546(e) applies. For the reasons above, the Final Judgment will be affirmed. The Court will issue a separate Order consistent with this Opinion.